# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-1384V

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                    *
MARK RADKE,                         *       Chief Special Master Corcoran
                                    *
            Petitioner,             *       Filed:  June 8, 2026
                                    *
        v.                          *
                                    *
SECRETARY OF HEALTH AND             *
HUMAN SERVICES,                     *
                                    *
            Respondent.             *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Amber Diane Wilson*, Wilson Science Law, Washington, DC, for Petitioner.

*Tyler King*, U.S. Department of Justice, Washington, DC, for Respondent.

### <u>DECISION ON REMAND DENYING ENTITLEMENT</u>[1]

On September 27, 2022, Mark Radke filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleges that he suffered polymyalgia rheumatica ("PMR") after receipt of a pneumococcal conjugate vaccine on September 30, 2019. Petition (ECF No. 1) at 1.

The Vaccine Program has routinely dismissed claims alleging PMR as a vaccine injury— regardless of the vaccine involved—and I had held a trial in a PMR case featuring a highly-similar causation theory. Because of my resulting reasoned skepticism as to the claim's viability, I directed the parties to brief the matter. *See* Petitioner's Brief in Support of Entitlement, dated Jan. 10, 2025

---

[1] "Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id."*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

(ECF No. 36) ("Br."); Respondent's Opposition, dated Mar. 21, 2025 (ECF No. 39) ("Opp."); Petitioner's Rebuttal Brief, dated Apr. 18, 2025 (ECF No. 41) ("Reply").

I subsequently denied entitlement—and attempted to do so in as succinct a manner as possible, referencing not only my prior experience with claims involving PMR (in some instances advanced by the same current counsel and expert offered in this matter) but the fact that numerous prior special masters had reached the same conclusion. Decision, dated Oct. 6, 2025 (ECF No. 43) (vacated on remand). Petitioner, however, has successfully appealed the decision on review, and I am now directed by the Court of Federal Claims to provide more detail as to the basis for my determination. *See Radke v. Sec'y of Health & Hum. Servs.*, No. 22-1384, 2026 WL 1132925 (Fed. Cl. Apr. 2, 2026) (the "Remand Order").

Herein I provide my reasoning for why I again deny entitlement in this matter. It simply has not been demonstrated that the pneumococcal vaccine can likely cause PMR.

## I.    Factual Background

*Pre-Vaccination Medical History*

Petitioner experienced a number of treatment events in the years before the vaccination at issue that arguably bear on his alleged injury. For example, in mid-2014, injuries to his right knee were deemed by treaters significant enough to make him a good candidate for a knee replacement procedure. Ex. 11 at 19–20. It was observed as early as 2015 that Petitioner had a history of lower limb neuropathy, featuring paresthesias and reduced reflexes, that impacted his ambulation. Ex. 19 at 268–70, 306–07. These neurologic issues lead in February 2015 to a diagnosis of peripheral neuropathy. *Id.* at 270. An EMG[3] performed that spring confirmed the presence of early axonal sensorimotor neuropathy. *Id.* at 266. These kinds of symptoms continued to plague Petitioner in 2015, although treaters did not propose any neuropathic-specific medications or comparable interventions. *Id.* at 216–17.

In 2017, Petitioner sought treatment for a worsening rash, and also reported muscle weakness and fatigue. Ex. 19 at 271, 273. He underwent a brain MRI that August, although its findings shed no light on possible explanations for some of his complaints. Ex. 18 at 58. He was later treated again for neuropathic symptoms, and now reported mild progression to his upper extremities. Ex. 20 at 3, 7. Petitioner informed some neurologists that the symptoms had existed for several years. Ex. 14 at 1, 4. Testing did not, however, aid in identifying an etiologic explanation for these symptoms. *Id.* at 6–10. In the fall of 2017, Petitioner also saw an endocrinologist, who proposed that alcohol use might explain Petitioner's condition. Ex. 15 at 33.

---

[3] "Electromyography" is defined as "an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contradictions, and during electrical stimulation; performed using any of a variety of surface electrodes, needle electrodes, and devices for amplifying, transmitting, and recording the signals." *Electromyography*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15854&searchterm=electromyography (last visited June 8, 2026).

Petitioner continued in 2018 to explore his health concerns with a variety of treaters. He sought help in January 2018 for head pain and strange sensations, although testing identified no explanation for the symptoms. Ex. 14 at 25, 29–31. He reported more neuropathic concerns that summer, coupled with weakness and fatigue, but a repeat MRI revealed nothing of concern. *Id.* at 39, 43–45. He complained of tinnitus and hearing loss in October 2018. Ex. 13 at 45, 47. In July 2019 (two months before vaccination), he again sought treatment for tinnitus and polyneuropathy concerns, although his symptoms were then deemed to be stable. Ex. 14 at 58. (The record also reveals that Petitioner received a flu vaccine dose in late-August 2019. Ex. 24 at 130. Although Petitioner's causation theory focuses on the subsequently-received pneumococcal vaccine, that theory at certain points attempts to bootstrap into the analysis the impact of this earlier vaccination, as discussed below).

*Vaccination and Purported Adverse Impact*

Mr. Radke was sixty-seven years old when he received a pneumococcal vaccine on September 30, 2019. Ex. 2 at 21. Two days later (October 2, 2019), Petitioner went to see his neurologist, Dr. Terry Wimpey, for follow-up evaluation of his preexisting neuropathy symptoms. Ex. 3 at 2. Petitioner now stated that he had been feeling increasing right leg neuropathy for the past week (which would mean the pain began *prior* to the vaccination), and that he was feeling "pain behind his calf associated with the neuropathy and muscle tightness" causing him to limp. *Id.* Examination revealed nothing inconsistent from prior treatment encounters, however, and Petitioner was referred to physical therapy ("PT") for treatment of his symptoms. *Id.* at 6.

A month later (November 1, 2019), Petitioner went to orthopedist John Manfredi for treatment of his prior, ongoing right knee pain. Ex. 11 at 16. He now stated, however, that the pain had worsened over the past month, and he reported that he had experienced pain and swelling the day after vaccination. *Id.* X-rays of Petitioner's right knee, however, revealed only evidence of preexisting knee concerns (severe degenerative changes in the knee and calcifications throughout the medial femoral condyle). *Id.* at 17. Petitioner was provided a lidocaine injection at this visit to treat his knee. *Id.*

That same November, Petitioner saw a different orthopedist for shoulder pain that he related to falling out of bed the prior month. Ex. 4 at 2. He fell a second time in November, resulting in an emergency room visit. Ex. 2 at 94. He claimed at this time that he had been experiencing chronic muscle aches, weakness, and headaches following his receipt of a pneumococcal vaccine. *Id.* His examination was normal, additional testing did not reveal any concerns, and he was eventually discharged home. *Id.* at 95. A post-ER visit to Dr. Wimpey resulted in the same kind of normal exam, but blood work revealed a somewhat-elevated CRP[4] and sedimentation rate—both

---

[4] "C-reactive Protein" or "CRP" is defined as "a globulin that forms a precipitate with the somatic C-polysaccharide of the pneumococcus in vitro; it is the most predominant of the acute-phase proteins." *C-Reactive Protein*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=100489 (last visited June 8, 2026).

of which are biomarkers for inflammation. Ex. 9 at 138–39. Later in November, Petitioner began PT for right shoulder and knee issues (and was later discharged from PT the following winter after reporting improvement). Ex. 16b at 1, 106.

On December 6, 2019, Mr. Radke saw rheumatologist Sana Makhdumi, M.D., with complaints of weight loss, fever, and night sweats, which he deemed to have begun two days after his receipt of the pneumococcal vaccine. Ex. 5 at 95. But the sole abnormality identified after examination was "some pain" upon rotation of Petitioner's hips. *Id.* at 96. Dr. Makhdumi was unable to propose an explanation for Petitioner's complaints, although she did express concern that he was experiencing some form of inflammatory arthritis—PMR or rheumatoid arthritis ("RA") —that could have an infectious or neoplastic cause. *Id*. Dr. Makhdumi prescribed a steroid taper, and also tested for two viral infections (Epstein-Barr ("EBV") and cytomegalovirus). *Id.* Petitioner tested positive for a prior/resolved EBV infection, and also again displayed an elevated sedimentation rate (although it was deemed within a normal limit after repeat testing from the following month). Ex. 9 at 127, 130–31.

*2020 Treatment*

On January 7, 2020, Petitioner returned to Dr. Makhdumi for follow up of his symptoms. Ex. 5 at 93. He felt the prednisone was not working, and he was experiencing side temporal headaches. *Id*. Examination revealed some limitations with movement of Petitioner's spine, knees, and hips. *Id*. at 94. Dr. Makhdumi's differential diagnosis now included giant cell arteritis ("GCA")[5] versus PMR versus reactive arthritis, and she altered Petitioner's steroid dose while referring him for a temporal artery biopsy and eye exam. *Id*. The eye exam yielded normal results, however, and Petitioner later decided to cancel the biopsy. Ex. 5 at 91; Ex. 12 at 10–14. Petitioner also saw Dr. Wimpey in January, and reported a cessation of headaches and improvement in how his shoulder felt. Ex. 14 at 89.

In February, Dr. Makhdumi reduced Petitioner's prednisone dose, while maintaining a differential comparable to what she had previously proposed (and keeping PMR in it). Ex. 5 at 88–89. Petitioner again visited the ER that month, complaining of left upper extremity numbness, heart flutters, mild left sided chest tightness, disequilibrium, and two days of mild urinary frequency. Ex. 2 at 170. But his exam was normal and he was again discharged. *Id*. at 173. He had a second ER visit later that month, reporting right calf pain and swelling. *Id.* at 223–24. An

---

[5] "Giant Cell Arteritis" is defined as "a chronic vascular disease in the elderly, of unknown origin, often associated with polymyalgia rheumatica, seen usually in the external carotid arteries but sometimes in other arteries. Characteristics include proliferative inflammation, often with giant cells and granulomas; headache; pain with chewing; weight loss; fever; sometimes ocular symptoms; and increased erythrocyte sedimentation rate." *Giant Cell Arteritis*,    Dorland's    Medical    Dictionary    Online, https://www.dorlandsonline.com/dorland/definition?id=58337&searchterm=giant+cell+arteritis (last visited June 8, 2026).

ultrasound showed fluid collection consistent with a ruptured Baker's cyst, and it was treated. *Id.* at 227.

On March 19, 2020, Petitioner saw rheumatologist Stephen Elmore, M.D., for a second opinion regarding his symptoms, which he felt were not being ameliorated by prednisone. Ex. 5 at 80. Examination revealed some soreness to Petitioner's shoulders with range of movement, slightly decreased strength, and tenderness to Petitioner's right wrist. *Id.* at 82. Dr. Elmore expressed concern for PMR versus seronegative RA, and proposed more blood tests plus different medications. *Id.* at 83. Petitioner continued to see Dr. Elmore in the coming months. Ex. 5 at 74 (June visit), 75, 78 (May 2020 visit). Dr. Elmore again noted difficulty in assessing the nature of Petitioner's illness (while maintaining PMR in the differential), but also observed that there was no evidence of inflammatory biomarkers, and that treatments were presuming that some kind of rheumatic condition existed. By July, however, Petitioner informed Dr. Elmore that he felt better overall, and Dr. Elmore directed a tapering of Petitioner's prednisone treatments. *Id.* at 65. A similar assessment was provided by Dr. Elmore in September. *Id.* at 24–25, 60, 63.

*Treatment Beyond 2021*

Petitioner has produced a large number of medical records reflecting treatment he received from 2021 to the fall of 2022, but they shed little to no light on the issue of vaccine causation. Petitioner continued at times to deem some of his non-orthopedic symptoms to reflect PMR, and/or to identify them as beginning close-in-time to vaccination. And while PMR remained a fair explanation for these symptoms, no treaters appear to have themselves proposed a *vaccination-related etiology* for it. *See, e.g.*, Ex. 5 at 5 (September 2022 visit with Dr. Elmore).

## II.    Expert Opinions

### A.    Petitioner's Expert - Petros Efthimiou, M.D., FACR

Dr. Efthimiou, a rheumatologist, offered three written reports on behalf of Petitioner. *See* Report, dated Aug. 15, 2023 (ECF No. 25-1) ("First Efthimiou Rep."); Report, dated Apr. 19, 2024 (ECF No. 30-2) ("Second Efthimiou Rep."); Report, dated Sept. 13, 2024 (ECF No. 35-1) ("Third Efthimiou Rep."). Dr. Efthimiou opined that Petitioner's receipt of the pneumococcal vaccine "more likely than not was a substantial factor contributing to the onset of clinical polymyalgia rheumatica." First Efthimiou Rep. at 1.

Dr. Efthimiou received his medical degree from the University of Ioannina Medical School in Ioannina, Greece. Curriculum Vitae, filed as Ex. 26 (ECF No. 25-2) ("Efthimiou CV"). He then completed an internship in Internal Medicine at the University of Iowa Hospital and Clinics, followed by his residency in Internal Medicine at Brown University and a fellowship in Rheumatology at the Hospital for Special Surgery and New York Presbyterian and Memorial Sloan Kettering Cancer Center Hospital. *Id.* at 1–2. Dr. Efthimiou currently serves as an Associate

Professor of Medicine at St. George's University School of Medicine and Ross University Medical School. *Id.* at 2. He is board-certified by the American Board of Internal Medicine in Rheumatology and has an active clinical practice. Efthimiou CV at 3; First Efthimiou Rep. at 1. Throughout his clinical career, Dr. Efthimiou has frequently evaluated and treated individuals with PMR, and he has spent the last twenty-one years researching inflammatory rheumatic conditions, such as PMR and other associated inflammatory disorders. First Efthimiou Rep. at 1–2.

### First Report

Dr. Efthimiou maintained at the outset of his first report that "[t]he current understanding of the pathogenesis of PMR is a consensus model of immune-mediated disease that includes the interaction of multiple factors, both genetic and environmental." First Efthimiou Rep. at 15; D. Camellino et al., *Pathogenesis, Diagnosis and Management of Polymyalgia Rheumatica*, 36 Drugs & Aging 1015 (2019), filed as Ex. 28 (ECF No. 25-4) ("Camellino"). Given its understood likely pathogenesis, Dr. Efthimiou deemed it reasonable to propose that multiple vaccine types could be associated with triggering the onset of the disease—noting that PMR can be clinically expressed in predisposed individuals by an environmental stimulus.

There is generally a broad spectrum for inflammatory rheumatic diseases, and that spectrum includes autoinflammatory and autoimmune diseases. First Efthimiou Rep. at 17. "Autoinflammatory" would mean "an aberrant activation of the innate immune response without autoantibody production," while "autoimmune" refers to "a dysregulated adaptive immune response and by the presence of organ-specific (pathogenic) antibodies." *Id.* PMR, he proposed, falls between these two possible pathogenic etiologies. E. Hysa et al., *Immune System Activation in Polymyalgia Rheumatica: Which Balance between Autoinflammation and Autoimmunity? A Systemic Review*, 21 Autoimmunity Reviews 1, 7 (2022), filed as Ex. 30 (ECF No. 25-6) ("Hysa") (suggesting that "the balance of [PMR] between autoinflammation and autoimmunity seems to lie halfway … by considering both ends of the pathophysiological spectrum of immune-mediated rheumatic disease, PMR might be regarded as an inflammatory immune-mediated disease with mixed mechanisms"). As a result, Dr. Efthimiou opined, it did not matter where PMR fit on that spectrum, since "the vaccines administered can reliably explain clinical onset of either subtype of immune mediated response." First Efthimiou Rep. at 17.

Dr. Efthimiou maintained that PMR likely clinically presents due to an environmental trigger, such as infection or vaccination, which then dysregulates an individual's T-cell response. First Efthimiou Rep. at 17. In support, he referenced government publications about how vaccine-caused adverse events can occur. *Committee to Review Adverse Effects of Vaccines: Evidence and Causality* 59–60 (K. Stratton et al., eds., 2012), filed as Ex. 33 (ECF No. 25-9) (the "IOM Rep.") (listing T-cells as contributing to the development of adverse events after vaccination). T-cells, he contended, are integral to an individual's maintenance of the immune system and self-tolerance. First Efthimiou Rep. at 18. But PMR is understood to mechanistically arise as a result of the disruption of one's self-tolerance by certain T-cells and their inability to prevent autoreactivity. *Id.*

Components in a particular vaccine could initiate autoreactive T-cells that in turn attack the body while providing aberrant immune signals leading to dysregulation and clinical disease onset. First Efthimiou Rep. at 18. Here, Petitioner may have already possessed these autoreactive cells due to previous vaccine exposure or some different environmental exposure. *Id.* Because a vaccine has the potential to trigger "already present" immune cells" in an individual, Dr. Efthimiou argued, the vaccine "could be" triggering a non-specific immune signal which adversely activates another immune signal and leads to disease onset. *Id.* at 18–19; IOM Rep. at 82 (explaining that both epidemiological and mechanistic research has recognized that individuals experiencing an adverse reaction to vaccine administration have a predisposition that can exists for several reasons, including genetics, intervening illness, or prior immunological and environmental exposures).

Medical literature has recognized an association between the seasonal flu and/or Tdap vaccine, on the one hand, and PMR, and in Dr. Efthimiou's view such evidence bore on Mr. Radke's circumstances. In support, Dr. Efthimiou referenced a number of case reports and/or case series observing a temporal association between vaccination and PMR. *See generally* A. Soriano et al., *Giant Cell Arteritis and Polymyalgia Rheumatica After Influenza Vaccination: Report of 10 Cases and Review of the Literature,* 21 Lupus 153 (2012), filed as Ex. 27 (ECF No. 25-3) ("Soriano"); E. Liozon et al., *Giant Cell Arteritis or Polymyalgia Rheumatica after Influenza Vaccination: A Study of 12 Patients and a Literature Review*, 20 Autoimmunity Rev. 1 (2021), filed as Ex. 32 (ECF No. 25-8) ("Liozon"); P. Falsetti et al., *Polymyalgia Rheumatica following Infective Triggers or Vaccinations: A Different Subset of Disease?*, 58 Rheumatologia 76 (2020), filed as Ex. 29 (ECF No. 25-5) ("Falsetti").

Although the vaccine involved in this case is different, Dr. Efthimiou maintained that "a mechanism common to both vaccines [flu versus pneumococcal] was discovered as both vaccines shared profiles related to myeloid lineage and inflammation," making them equivalent in their respective capacities to spur an aberrant immune reaction. First Efthimiou Rep. at 20–21; G. Obermoser et al., *Systems Scale Interactive Exploration Reveals Quantitative and Qualitative Differences in Response to Influenza and Pneumococcal Vaccines,* 38 Immun. 4:831 (2013), filed as Ex. 34 (ECF No. 26-1) ("Obermoser"), at 2 (a comparison of the flu vaccine with the pneumococcal vaccine demonstrated that the two vaccines "elicit common, as well as distinct, transcriptional signatures, both early (innate immunity) and late (adaptive immunity), that eventually lead to the development of protective antibody responses").

Dr. Efthimiou further attempted to link the version of the pneumococcal vaccine covered by the Program and other vaccines, in particular Tdap. The covered pneumococcal vaccine includes bacterial components conjugated to a carrier protein, $CRM_{197}$[6]—thus, making any reported associations with the Tdap vaccine (which Dr. Efthimiou alleged contain the same

---

[6] $CRM_{197}$ is a genetically detoxified mutant of diphtheria toxin. Because it is naturally non-toxic but highly immunogenic, it is widely used as a carrier protein in conjugate vaccines like the pneumococcal vaccine, in order to boost the body's immune response against the polysaccharide bacterial components. *see Deshler v. Sec'y of Health & Hum. Servs.*, No. 16-1070V, 2020 WL 4593162, at *11, 19 (Fed. Cl. Spec. Mstr. July 1, 2020).

diphtheria proteins) relevant when analyzing Petitioner's case. First Efthimiou Rep. at 20. Because these vaccines share the diphtheria toxoid component, they are equally capable of eliciting B-cell responses in a T-cell dependent manner, making it reasonable to conclude that Petitioner's immune response post-vaccination became more susceptible to triggering cross-reactive immune memory cells, and hence causing PMR. *Id.*

Dr. Efthimiou also endeavored to demonstrate that Petitioner's receipt of a flu vaccine dose the month before the vaccination at issue could have played a role in development of PMR. First Efthimiou Rep. at 19, 20. In support, he noted the literature he had offered that associated this vaccine with PMR. *Id.* at 19; Soriano; Liozon. He also emphasized Obemoser's findings that the flu vaccine elicited the same kinds of cytokines and immune cell response as pneumococcal, even if the two vaccines were distinguishable. First Efthimiou Rep. at 20. And other evidence established that the immune response to the flu vaccine would peak within four to six weeks of administration—consistent with the time Petitioner received the pneumococcal vaccine approximately a month later. S. Rastogi et al., *Time to Peak Serum Antibody Response to Influenza Vaccine,* 2 Clin. & Diag. Lab. Immunol. 1:120 (1995), filed as Ex. 35 (ECF No. 26-2) ("Rastogi"). Thus, Dr. Efthimiou suggested the two vaccines could have somehow contributed to Petitioner's PMR (although he did not explicitly set forth in his first report how this could have occurred).

*Second Report*

Dr. Efthimiou's second report responded to comments made by Respondent's diagnostic expert, Dr. Chester Oddis. He first addressed Dr. Oddis's opinion that Petitioner's more likely diagnosis was an "exaggerated pain response," evidenced by interactions with his surgeon following his knee replacement surgery. Second Efthimiou Rep. at 1. Dr. Efthimiou maintained in reaction that studies have reported that "peripheral arthritis has been described in up to 50% of patients with PMR with knee involvement present in the majority." *Id.* (citing M. Cimmino et al., *High Frequency of Capsular Knee Involvement in Polymyalgia Rheumatica/Giant Cell Arteritis Patients Studied by Positron Emission Tomography*, 52 Rheumatology 1865 (2013), filed as Ex. 40 (ECF No. 30-3) ("Cimmino"). Moreover, recent research on the pathophysiology of PMR has confirmed the frequency of knee involvement. *See* K. Kobayashi et al., *Ultrasound of Shoulder and Knee Improves the Accuracy of the 2012 EULAR/ACR Provisional Classification Criteria for Polymyalgia Rheumatica*, 61 Rheumatology 1185, 1180 (2022), filed as Ex. 41 (ECF No. 30-4) ("Kobayashi") (finding that the data revealed not only the shoulder but also the knee [as] the joint where [ultrasound] abnormalities are frequently detected … 95% of patients with definite PMR had some [ultrasound] abnormalities in the knee, whereas 77% and 10% had tenderness and swelling, respectively.").

Here, between October and November 2019 (and hence after the September vaccination), Mr. Radke reported that his chronic right knee pain had worsened, and he noticed an acute change in pain over the past month. Second Efthimiou Rep. at 1; Ex. 24 and 139.  Petitioner consistently reported a difference in his knee pain to his primary care physician, Dr. Young, as well as pain

that occurred suddenly. Because, Dr. Efthimiou argued, "PMR arthritis is an inflammatory arthritis that is known to occur suddenly, and joint "warmth" is a hallmark of inflammatory arthritis"—both of which were reported and documented in Petitioner's medical records—the onset of these problems was consistent with a PMR diagnosis. Second Efthimiou Rep. at 3.

Dr. Efthimiou then described "atypical" PMR, and how that descriptor best fit Petitioner's clinical presentation. Second Efthimiou Rep. at 3. While patients with "classic" PMR present more commonly with bilateral shoulder abnormalities (such as bursitis or bicep tenosynovitis), patients with an atypical clinical presentation commonly report a history of pain and swelling in the knee, symptoms of carpal tunnel syndrome, or pain localized to both knees with radiation. *Id.* at 4; M. Fitzcharles & J. Esadile, *Atypical Presentation of Polymyalgia Rheumatica*, 33 Arthritis & Rheum 403, 406 (1990), filed as Ex. 42 (ECF No. 30-5) ("Fitzcharles & Esadile") (describing six patients that did not present with any symptoms referable to the limb girdles, and where five out of the six patients developed a more typical presentation of PMR over the course of two to twelve months). Dr. Efthimiou noted, however, that "the differential diagnosis of PMR can have overlapping symptoms," and that "[t]he most challenging mimicking disorder" is seronegative RA. Second Efthimiou Rep. at 4. Concurring with Dr. Oddis, Dr. Efthimiou maintained that seronegative RA, along with other mimicking PMR disease, had properly been ruled out by Petitioner's treating physicians. *Id.*

Regarding Petitioner's inflammatory markers throughout his treatment course, Dr. Efthimiou noted that Mr. Radke had two documented inflammatory increases—on May 5, 2020, and then on February 21, 2022. *Id.* Although Dr. Oddis argued that Petitioner's inflammatory markers were not consistent, Dr. Efthimiou responded that "[s]ymptoms and ESR/CRP levels[7] are often not concordant"—stating that "[p]atients with PMR can present with normal ESR values and in patients with relapse, ESR levels have been observed in 68% of cases and CRP levels normal in 62% of cases." *Id.* at 5 (referencing M. Florescu et al., *Polymyalgia Rheumatica: An Update (Review)*, 26 Experimental & Therapeutic Medicine 1, 4 (2023), filed as Ex. 44 (ECF No. 30-7) ("Florescu"). Despite the medical records demonstrating multiple instances of normal labs over the course of Petitioner's treatment course, Dr. Efthimiou opined that Petitioner exhibited a "relapsing course [of PMR] that requires longer treatment." Second Efthimiou Rep. at 5 (emphasizing Dr. Oddis' citation to literature discussing slower response times to treatment with low-dose glucocorticoids).

---

[7] ESR stands for "erythrocyte sedimentation rate," and is defined as "the rate at which erythrocytes precipitate out from a well-mixed specimen of venous blood, measured by the distance the top of the column of erythrocytes falls in a given time interval under specified conditions; an increase in rate is usually due to elevated levels of plasma proteins, especially fibrinogen and immunoglobulins, which decrease the zeta potential on erythrocytes by dielectric shielding and thus promote rouleau formation. It is increased in monoclonal gammopathy, hypergammaglobulinemia due to inflammatory disease, hyperfibrinogenemia, active inflammatory disease, and anemia." *Erythrocyte Sedimentation Rate*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=102146 (last visited June 8, 2026).

Dr. Efthimiou concluded his second report reiterating his overarching opinion—that Petitioner's development of PMR was likely triggered by his receipt of the pneumococcal vaccine, and that his clinical presentation and course was most representative of a probable post-vaccination cause. *Id.* at 6.

*Third Report*

In his final report, Dr. Efthimiou addressed the assertion of Respondent's causation expert, Dr. Stephen Jameson, that it is essential to consider whether there is a likely link between a specific vaccine and a given autoinflammatory disease in the medical literature before proposing an association. Third Efthimiou Rep. at 2. In response, Dr. Efthimiou instead maintained that his own analysis "focused on reliably explaining why the vaccines administered and [Petitioner's] sequence of immunological events is supported by both the clinical evidence and a biologically plausible mechanistic explanation …" *Id.* Moreover, Dr. Efthimiou reiterated that his medical theory causally linking Petitioner's receipt of the vaccine and his development of PMR was based on reliable medical and scientific information. *Id.*

Dr. Efthimiou briefly acknowledged his disagreement with Dr. Jameson's understanding of the level of support needed to confirm a medical theory causally connecting the pneumococcal vaccine and PMR. Third Efthimiou Rep. at 3. He explained that both "scientific" and "medical" literature are necessary when evaluating Petitioner's overall clinical sequence—and here, Dr. Efthimiou argued, the literature supported a finding that Petitioner's vaccination and subsequent development of PMR represents a vaccine-associated cause. *Id.* at 3–4. In his own analysis, Dr. Efthimiou stated, he examined "the totality of th[e] clinical information that supports how a biologically plausible mechanistic link connects the pneumococcal vaccination to being capable of initiating the understood adverse pathology of PMR illness." *Id.* at 4.

Dr. Efthimiou then addressed criticisms that he had generalized outcomes of other case studies or reports involving different vaccines as supporting the capacity of the pneumococcal vaccine to trigger the onset of PMR. He asserted that "at least 21" instances of PMR after receipt of a pneumococcal vaccine had been reported in the "Vaccine Adverse Event Reporting System," or "VAERS." Third Efthimiou Rep. at 5.[8] And while case reports pertaining to other vaccines also being associated with PMR are "not intended, especially in isolation, to provide general conclusions" about vaccine association (especially since the risk was low), they still had evidentiary value. Clinical associations between PMR and different types of vaccine antigens, did not, according to Dr. Efthimiou, "equate to different adverse biological mechanisms explaining how a patient's PMR illness can reliably be pathologically caused within a few days." *Id.* at 7. And he discounted the absence of epidemiologic evidence, noting that "if epidemiological studies observed an increased risk of PMR illness in association with receiving pneumococcal vaccines, administration of the vaccine would not be recommended." Third Efthimiou Rep. at 5 (citing T.

---

[8] The source for this contention is not evident from any items filed in conjunction with any of Dr. Efthimiou's reports.

Shimabukuro et al., *Safety Monitoring in the Vaccine Adverse Event Reporting System (VAERS)*, 33 Vaccine 4398 (2015), filed as Ex. 47) (ECF No. 35-2) ("Shimabukuro").

Dr. Efthimiou also attempted in his third report to explain in greater detail how the flu vaccine dose Petitioner received the month before administration of the pneumococcal vaccine could have also played a role in the development of PMR. Third Efthimiou Rep. at 7–9. He contended that both vaccines had been shown to have the capacity to "directly activate" an immediate, innate response—and that this was meaningful given that (a) Petitioner had received the pneumococcal vaccine before, and (b) the impact of the flu vaccine administration would still be present as of late September 2019. *Id.* at 7–8. In addition, the medical record evidence established that Petitioner was experiencing a flare-up of preexisting peripheral neuropathy symptoms by early October 2019, and by November the impact of the pneumococcal vaccine would peak as well. *Id.* at 8. Thus, "[t]he evidence supporting that the flu vaccines are associated with initiating the same innate immune responses as pneumococcal vaccinations biologically links the clinical data associating the onset of PMR illness with both the flu vaccine and the tetanus toxin containing vaccine." *Id.* at 8–9.

B.    Respondent's Experts

*1. Chester V. Oddis, M.D.*

Dr. Oddis, a rheumatologist, offered one written report on behalf of Respondent. *See* Report, dated Dec. 26, 2023 (ECF No. 29-1) ("Oddis Rep."). Based on his years of experience in the practice of clinical inpatient and outpatient rheumatology, Dr. Oddis opined that Petitioner did not have PMR, and that he also did not suffer from vaccine-induced PMR. Oddis Rep. at 12.

Dr. Oddis received his undergraduate degree from the University of Pittsburgh, and his medical degree from Pennsylvania State University College of Medicine. He is board-certified in both Internal Medicine and Rheumatology. Oddis Rep. at 1. Dr. Oddis is currently Professor of Medicine in the Division of Rheumatology and Clinical Immunology and the Director of the Myositis Center in the School of Medicine at the University of Pittsburgh. *Id.* His primary area of research and clinical care is in the clinical, epidemiologic, serologic and treatment aspects of myositis and autoimmune interstitial lung disease. *Id.* Dr. Oddis has also published numerous journal articles on these subjects. *Id.* at 2. Over the course of his clinical career, Dr. Oddis has diagnosed, treated, and managed the care of many individuals with PMR and other rheumatological disease. *Id.*

Dr. Oddis summarized the pertinent medical facts before discussing PMR in general. *See generally* Oddis Rep. at 2–8. PMR is understood as a common inflammatory rheumatic condition, oftentimes characterized by prominent morning stiffness of the shoulder, hip girdle, and neck. *Id.* at 8; C. Salvarani & F. Muratore, *Clinical Manifestations and Diagnosis of Polymyalgia Rheumatica*, UpToDate (Oct. 2023), filed as Ex. A Tab 1 (ECF No. 29-2) ("Salvarani & Muratore") at 1. PMR is found in individuals almost exclusively over the age of 50, and with a

peak incidence occurring between the ages of 70 and 80. Oddis Rep. at 8; Salvarani & Muratore at 2. Dr. Oddis further explained that the clinical manifestations of PMR include an abrupt onset of symmetrical aching and stiffness of the shoulders, hip girdle, neck and torso, with pain being the worst in the morning. Oddis Rep. at 8; Salvarani & Muratore at 4. Approximately 70–95% of patients with PMR will exhibit bilateral shoulder pain as the presenting clinical manifestation, with about 50% exhibiting lower extremity symptoms. Salvarani & Muratore at 4. Patients with PMR, however, can also present with non-specific signs or symptoms, such as malaise, fatigue, depression, weight-loss or low-grade fever. *Id.* at 5; Oddis Rep. at 8.

Dr. Oddis then discussed the common laboratory findings in PMR—emphasizing the significance of the diagnostic value of inflammatory biomarkers like ESR and CRP. Oddis Rep. at 9. ESR, the "traditional laboratory finding in PRM," typically ranges from mildly to markedly increased, whereas CRP is "nearly always elevated." Salvarani & Muratore at 5 (stating that "in two reports, an elevated ESR (greater than 30 mm/hour) was noted in 92 to 94 percent of patients at the time of diagnosis of PMR, while 99 percent of such patients had an increased serum CRP level (greater than 5mg/L)."). Here, Petitioner's inflammatory markers, specifically ESR and CRP, were not "consistently concordant with either an improvement or an exacerbation of PMR symptoms." Oddis Rep. at 10. Similarly, during a follow-up with Dr. Young on June 15, 2021, Petitioner reported "constant morning stiffness" but his inflammatory markers at that time were noted as within the normal range. Ex. 5 at 46, 49. Dr. Oddis stated that this instance, among others noted in the medical records, indicates an inconsistency between Petitioner's symptoms and lab results and proposed diagnosis. Oddis Rep. at 10.

The initial treatment course for PMR typically involves the use of low-dose glucocorticoids (i.e., Prednisone) and the therapeutic response is understood to be brisk and complete. Oddis Rep. at 9. Patients oftentimes start with a suggested dose of 15mg/day; however, lower dosages may be more appropriate for certain individuals. *Id.* On the other hand, chronic management of PMR involves the gradual tapering of the Prednisone dosage, of which the duration of treatment can vary among individuals (i.e., some patents can wean off treatment in 1 to 2 years, while others require longer). *Id.* Dr. Oddis emphasized not only how unusual it was that Petitioner's Prednisone dosage fluctuated greatly throughout his treatment course, but that the dosage often exceeded 20mg/day—a level that generally aids in alleviating symptoms of PMR quickly and completely. *Id.* at 11; C. Salvarani & F. Muratore, *Treatment of Polymyalgia Rheumatica*, UpToDate (Oct. 2023), filed as Ex. A Tab 2 (ECF No. 29-3) at 1–2.

Based on the medical records and literature, Dr. Oddis opined that Petitioner more than likely did not have PMR. Oddis Rep. at 11. Petitioner's symptoms did not feature the classical presentation of bilateral shoulder pain and hip stiffness that improves throughout the day and responds well steroid treatment. *Id.* at 10. Moreover, Petitioner's treating physicians were not confident that his overall signs and symptoms were consistent for a diagnosis of PMR—and Dr. Oddis referenced a note from an April 2, 2020, visit with Dr. Young that stated "[w]e discussed that [Petitioner's] presentation has not been classic for PMR … the doses of prednisone which

have relieved [Petitioner's] symptoms are higher than which would normally be used in PMR." *Id.* at 11 (citing Ex. 24 at 186). In addition, Petitioner's treating physicians ruled out other inflammatory and non-inflammatory diseases that can sometimes mimic PMR, such as elderly onset RA, late-onset spondyloarthropathy, inflammatory myopathy, lupus, various forms of vasculitis, calcium pyrophosphate deposition disease, or infection. Oddis Rep. at 9.

### 2. Stephen C. Jameson, Ph.D.

Dr. Jameson, an immunologist, offered one written report on behalf of Respondent. *See* Report, dated June 25, 2024 (ECF No. 34-1) ("Jameson Rep."). Dr. Jameson opined that it is more likely than not Petitioner's receipt of the pneumococcal vaccine on September 20, 2019, did not cause his development of PMR. Jameson Rep. at 5.

Dr. Jameson attended the University of Bristol, England for his undergraduate degree in Cellular Pathology, and the University of Cambridge, England for his Ph.D. in Physiology and Genetics Research. Curriculum Vitae, filed as Ex. C (ECF No. 34-4) ("Jameson CV") at 1. He then completed a post-doctoral fellowship in Immunology at the Scripps Research Institute, La Jolla, California, and the University of Washington, Seattle, before establishing his own laboratory at the University of Minnesota in 1995. *Id.*; Jameson Rep. at 1. Dr. Jameson is currently a Professor in the Center for Immunology, Masonic Cancer Center and Department of Laboratory Medicine and Pathology, at the University of Minnesota Medical School. Jameson Rep. at 1–2. He has published over 130 primary research papers, as well as over 50 review articles—nearly all focusing on various topics in immunology and on the immune response to pathogens. *Id.* at 2. Dr. Jameson's primary research focus is the study of cellular immune response against pathogens and vaccines via animal models, and the impact the studied immune responses have on protective immunity, immunopathology, and autoimmunity. *Id.*

Dr. Jameson primarily focused his short report on responding to Dr. Efthimiou's proposition that Petitioner's immune response to his receipt of the pneumococcal vaccine subsequently led to the development of PMR. The innate immune response, Dr. Jameson explained, can be considered as "the acute response to infection, vaccination or tissue damage" that typically features the induction of inflammatory responses. Jameson Rep. at 3. This response involves several different cell types—predominantly myeloid cells, such as macrophages. *Id.*

When an individual has an immune response to a trigger such as an infection or vaccination, however, it is the *secondary*, adaptive immune response (involving primarily T- and B-cells) that takes over. Jameson Rep. at 3. This is because macrophages are usually insufficient in containing an individual's immune response to infection or vaccination. *Id.* Specifically, T-helper cells promote the activation of B-cells, which then lead to the production of "potent high-affinity antibodies, capable of neutralizing the pathogen or its toxins." *Id.* When a cooperative response exists between T-cells and B-cells, their populations of cells can persist long-term, thus, creating immunological memory. *Id.* Therefore, any future exposure to the same or related pathogens will

essentially trigger a faster and more effective adaptive immune response, Dr. Jameson opined. *Id.* But because vaccines (like the pneumococcal vaccine) are "attenuated compared to an infection" (which would have significantly more impact on the human immune response), "effective immune memory [due to vaccination] is typically generated without excessive or prolonged inflammation." *Id.*

Dr. Jameson briefly responded to Dr. Efthimiou's assertion that aspects of the innate and adaptive immune response have been observed in immunopathological responses, such as autoimmunity and autoinflammatory diseases—thus establishing that PMR may involve both autoimmune and autoinflammatory characteristics. Jameson Rep. at 3. Dr. Jameson, however, argued that simply because protective immune responses share pathways with autoimmune and/or autoinflammatory disease, this did not also suggest that activation of the pathway likely leads to illness. *Id.* If this were true, every infection or vaccination would result in "damaging autoinflammatory diseases and multiorgan autoimmunity," even though that is not the case. *Id.* Instead, Dr. Jameson maintained that the similarity between the types of pathways involved in protective and damaging inflammatory/immune responses can exist without both being equally capable of sparking a disease process. *Id.*

When considering whether a causal link exists between a given infection or vaccination and a specific autoimmune/autoinflammatory disease, Dr. Jameson maintained, the scientific community looks for reliable evidence such as epidemiological and mechanistic studies (although he admitted that establishing sound bases for concluding causality under such circumstances was difficult). Jameson Rep. at 3, 4. But here, there was very little in the way of medical literature suggesting the existence of a causal link between infections and/or vaccination and PMR. *Id.* at 4. At most, Dr. Efthimiou had offered articles that discuss a possible connection between PMR and *different* vaccines, like the flu or Tdap vaccines—neither of which were relevant to Mr. Radke's case. Indeed, one such article ultimately concluded that "a causal association between [influenza vaccination] and GCA or PMR is *not supported* by adequate evidence." *Id.*; Liozon at 5 (emphasis added).

Dr. Efthimiou also proposed "a somewhat tortuous link" for a causal association, Dr. Jameson argued. Jameson Rep. at 5. Dr. Efthimiou had attempted to demonstrate an association between pneumococcal vaccine and PMR based upon the fact that the Tdap and pneumococcal vaccines arguably share a component—diphtheria toxoid, which Dr. Efthimiou analogized to the conjugate $CRM_{197}$ component in the pneumococcal vaccine—and therefore the pneumococcal vaccine could also provoke the onset of PMR in a manner comparable to the Tdap vaccine. *Id.*; *see also* Falsetti at 3 (two out of six PMR patients had received a Tdap-like vaccine prior to the onset of PMR). Dr. Jameson, however, took issue with Dr. Efthimiou's reliance on Falsetti— arguing that "all [one] can glean from [the] report is that those patients received tetanus toxoid vaccines—and since tetanus toxoid is *not* a component of the Prevnar 13 pneumococcal conjugate vaccine received by [Petitioner], this undercuts Dr. Efthimiou's argument that the presence of

14

diphtheria toxin in Prevnar 13 provides a mechanistic basis by which it could induce PMR, based on the literature." Jameson Rep. at 5.

Dr. Jameson ultimately maintained that Dr. Efthimiou's generalization that the "elements of the immune system that are involved in the response to vaccines are also involved in autoimmune response" is "not pertinent" when analyzing whether Petitioner's receipt of the pneumococcal vaccine on September 13, 2019, most likely led to his development of PMR. Jameson Rep. at 5. He opined instead that based on Petitioner's clinical presentation and course, as well as the medical literature, it was more likely than not that Petitioner's receipt of the vaccine at issue did not cause his alleged injury. *Id.*

## III.    Literature Overview

Petitioner filed 17 items of literature.[9] Special masters are not obligated to address in their written decision every single medical or scientific article filed in a case (and it is not presumed they did not *consider* a particular item just because it is not mentioned). *Moriarty v. Sec'y of Health & Hum. Servs.*, No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered"). Nevertheless, in order to fully meet the terms of the Remand Order, I shall herein address each item Petitioner filed[10]—and explain my construction of it and/or the weight I deem it merits.

### A.    *Soriano*

Soriano is a case series discussing ten instances (out of a cohort of 95 patients, which only included 22 actual PMR diagnoses) in which an individual reported receipt of a flu vaccine within two weeks to three months of receipt of a flu vaccine. Soriano at 154 Table 1. Of the ten, only five were diagnosed with PMR wholly or partially (with the related condition of GCA being the other diagnosis). The earliest an individual experienced onset was three weeks post-vaccination (with one patient experiencing a PMR relapse within two weeks). *Id.* The authors proposed the flu vaccine could trigger PMR in individuals with a genetic propensity, but admitted that they had

---

[9] I also permitted Petitioner the opportunity to file any "newly-published" materials (which I defined as published in 2025 or later, given that briefing on the claim was originally completed in  the spring of 2025) relevant to causation. *See* Scheduling Order, dated Apr. 9, 2026 (ECF No. 52). But he filed two articles that were published in *2024*, with no effort to explain how their submission comported with my Order. Moreover, these same two articles had already been offered in the course of resolving the Motion for Review, but rejected by the Court as untimely-submitted. Order Denying Motion, dated Jan. 8, 2026 (ECF No. 50). I therefore struck them from the record. Order, dated May 12, 2026 (ECF No. 55).

[10] I do not, however, include herein a detailed review of the items filed by Respondent. Respondent does not bear the burden of proof in Vaccine Act cases, and (based upon my review of Petitioner's evidence) I deem Petitioner to have failed to carry his *prima facie* case—based solely on what Petitioner filed.

relied on a small sample, and that the incidence for the sample (one of two patients experiencing PMR or GCA after vaccination) was less than predicted by other studies. *Id.* at 155.

Soriano is generally inapposite to this case, as it does not involve the pneumococcal vaccine. In addition, it based its conclusions upon an extremely small sample, and (as noted above and below) case reports deserve the lowest level of evidentiary weight in Vaccine Program cases. (I also observe that Soriano has been offered in prior cases that rejected causation arguments attempting to link covered vaccines to PMR—and hence its evidentiary strength has repeatedly been found inadequate, consistent with my own reading of the article).

B.      *Camellino*

Camellino is a general review article discussing PMR's characteristics, with some commentary on its suspected pathogenesis. It notes that PMR tends to impact women more than men, and most often in cohorts older than 50. Camellino at 2. It usually presents with shoulder and/or hip pain, spreading to the limbs and appearing both abruptly and progressively, with worse pain the night and early morning hours. *Id.* As far as cause, Camellino's authors noted that "we do not have a clear understanding of the etiology and pathogenesis of PMR," adding that it likely has a "multifaceted pathogenesis," and that possession of a particular gene complex may increase susceptibility to it.

Camellino makes no mention of vaccine causation—suspected, proposed, or investigated—of PMR. At most, its authors allow for the possibility of infectious agents as triggers, but linked PMR only to three (mycoplasma, parvovirus B19, and parainfluenza virus)—none of which are strong analogs for the pneumococcal vaccine. Camellino at 2. Its authors did discuss the role that an aberrant T cell response might play in PMR's pathogenesis, with T helper cells in particular, but did not propose how this dysregulated environment would come to be. *Id.* at 2–3.

C.      *Falsetti*

Falsetti's authors began with a group of 58 PMR patients, and from that cohort identified 15 patients who reported some environmental pre-onset stimulus (six vaccines (four flu versus two with tetanus toxoid) versus nine recalling some form of prior infection). Falsetti at 78. They went on to emphasize that it was "well known" that the flu vaccine was associated with PMR, but otherwise the focus of the paper was on the clinical features of environmentally-triggered PMR (including what certain inflammatory biomarkers were more likely to be seen in its context), as well as the general effectiveness of glucocorticoid treatments under such circumstances. *Id.* at 77–79 (finding "[t]hese data suggest that PMR triggered by an environmental factor could constitute a different subset of milder disease, as they have a more rapid response to GC therapy with a higher [form of inflammatory biomarker] at diagnosis). But the authors admitted that their "retrospective" data could not "provide information about the endocrinologic, immunological and genetic state of our PMR patients." *Id.* at 79.

16

Falsetti does mention two instances of PMR occurring after receipt of tetanus toxoid-containing vaccines, but such factual circumstances are not all that comparable to the pneumococcal vaccine's diphtheria conjugate component (as explained below). Moreover, Falsetti's authors relied on self-reporting from their patient sample of pre-onset vaccination, and focused far more on the flu vaccine as a potential environmental trigger.

D.    *Hysa*

Hysa is a review article that relied on a search of prior published studies involving PMR. Hysa at 1. It concludes (consistent with Dr. Efthimiou's contention) that PMR is mediated through some mix of autoinflammatory and autoimmune processes. *Id.* at 2, 7 ("PMR might be regarded as an inflammatory immune-mediated disease with mixed mechanisms in a background of genetic and epigenetic factors together with immunological and endocrine senescence"). Hysa does not, however, opine as to possible triggers of the mixed process it proposes leads to PMR (including vaccines). At most, it notes that

> despite the interesting role of B cells in active PMR, the titre of different autoantibodies does not appear to correlate with active disease and nor their pathogenetic role is supported by the literature. Therefore, their positivity has been interpreted as a consequence of hyper-inflammation or as cross-reactive phenomena triggered by environmental causes (e.g., infections) and antigenic release from damaged tissue/cells.

*Id.* at 7. In other words, autoantibodies may *appear* in the context of PMR and contribute to a disease process, but they are not understood to *initiate* the disease itself (and since vaccines are largely intended to promote antibody production as a first order goal, this further diminishes the possibility of vaccine causation). *Id.* ("[a]lthough the evidence supporting the role of autoantibodies pathogenicity seems lacking in PMR, their detection might provide indirect hints of its underlying immune-mediated mechanisms").

E.    I. Lundberg et al., *An Update on Polymyalgia Rheumatica,* 292 J. Int. Med. 717 (2022), filed as Ex. 31 (ECF No. 25-7) ("Lundberg").

Lundberg is a general review article discussing the diagnostic tools used to assess PMR, and treatment recommendations and issues. It includes the observation that PMR has been proposed to be possibly triggered by the flu vaccine (referencing in support Liozon (Lundberg at 718 n.20), which is discussed below), and that "a potential safety signal" in connection to a COVID-19 vaccine was observed in passive surveillance data obtained from a pharmacovigilance database (although the reference, which was not filed in this case, is explained by Lundberg's authors to deem the risk observed was less than what was true for the flu vaccine). Lundberg at 718. It also notes that PMR "is a disease of elderly people" (and hence its pathogenesis might have something to do with immune system senescence), and that no specific autoantibody is known to be associated with it. *Id.* at 719.

F.     *Liozon*

As Dr. Jameson noted in his report, Liozon does not stand as particularly strong support for the contention that the flu vaccine could trigger PMR. Liozon at 5. Liozon's authors began with an initial patient pool of 358 patients with GCA or GCA/PMR (diagnosed between 2002-2020), narrowing the sample to 10 patients (approximately three percent of the sample) who had received a flu vaccine prior to onset and developed GCA, with two additional individuals who developed PMR. Liozon at 3, 5. Both PMR patients manifested symptoms within 10 days of vaccination. *Id.* at 3. Thus, the sample relied upon to establish a vaccine link was exceedingly small.

Moreover, there are several other reasons to give Liozon little weight (ignoring the fact that it does not involve any of the vaccines at issue in this case—and its authors themselves discounted the strength of the causation showing their study proposed).[11] For example, Liozon's authors proposed that a specific form of HMC allele found in some humans was likely associated with GCA/PMR triggered by the flu vaccine (Liozon at 5)—something the Petitioner in this case has not been shown to possess. The authors also discuss the possibility that a "vigorous vaccine-induced immune reaction" in elderly patients may play a role in encouraging PMR triggering, invoking a concept ("autoimmune syndrome induced by adjuvants," or "ASIA") that has been consistently found to lack merit in numerous prior Vaccine Program cases. *Id.* at 1, 5, 6.[12]

G.     *IOM Report*

Petitioner filed *the entirety* of the IOM Report—all 131 pages of it. *See generally* Ex.33. This plainly exceeds what the occasion calls for (claimants would not need to file the entire dictionary if they wished to establish the spelling or meaning of a particular word), and the indiscriminate filing of such a lengthy article only obscures the pinpoint aspects of the document relevant to the causation theory at issue. The portions of this exhibit that have been highlighted do, however, set forth some general points claimants like to stress—for example, that epidemiologic evidence cannot preclude the possibility of a vaccine cause (IOM Report at IX–X, 39–47), that conclusions about vaccine-associated adverse events are not certain (*Id.* at XI), and (as Dr. Efthimiou maintained) that adverse events may not always be specific to a vaccine, but could reflect generalized immune system dysregulation (*Id.* at 82). However, the IOM Report is

---

[11] In fact, Liozon's authors specifically stated that 60 patients from the initial 358 sample of individuals reported "other potential triggers," such as infections or intercurrent illnesses, but "[n]o GCA onset after vaccination other than [flu] (*especially pneumococcal vaccination*) was reported by any patient." Liozon at 3 (emphasis added).

[12] *J.F. v. Sec'y of Health & Hum. Servs.*, No. 13-799V, 2022 WL 5434214, at *32 (Fed. Cl. Spec. Mstr. Sept. 9, 2022) (discussing weaknesses of ASIA as causation theory/injury); *Rowan v. Sec'y of Health & Hum. Servs.*, No. 10-272V, 2014 WL 7465661, at *12 (Fed. Cl. Spec. Mstr. Dec. 8, 2014) (rejecting the ASIA theory because it "is not a proven theory," and no "persuasive or reliable evidence" supports it), *aff'd,* 2015 WL 3562409 (Fed. Cl. 2015).

*completely silent on adverse events associated with the pneumococcal vaccine*, and also *does not identify PMR as an adverse event* associated with any of the vaccines it does consider.

H.    *Obermoser*

Obermoser aimed to evaluate the similarities and differences in the immune response (innate as well as adaptive) to the flu and a form of pneumococcal vaccine not covered in the Program, "Pneumovax 23").[13] Both were found to provoke similar activation of an innate response, with evidence of different cytokine (immune cell messengers) upregulation within hours of administration. Obermoser at 5. However, the subsequent adaptive responses were not temporally the same, with the response to the pneumococcal vaccine lasting longer. *Id.* at 6. The authors also observed that although the two vaccines had some common immune response mechanisms, the fact that the vaccines have distinguishable components meant that "different vaccines might lead to development of adaptive immunity through different innate immune pathways." *Id.* at 7.

At best, Obermoser stands for the proposition that vaccines can have a rapid impact on the initial, innate immune response, and that their subsequent effectiveness/temporality (when the adaptive leg begins) will depend on the specific nature of the bacterial/viral components of the vaccine. But this does not mean that what is known about the flu vaccine (here, that some studies *arguably* link it to PMR) applies with the same force to the pneumococcal vaccine. Obermoser comments not at all on PMR or other possible vaccine adverse events.

I.    *Rastogi*

Rastogi is a 31-year-old article that aimed to determine (based on a sample of 118 elderly patients) the timeframe it would take from the date of receipt of a trivalent form of flu vaccine to result in peak antibody response, determining that the general peak occurred within four to six weeks after vaccination, with no statistically significant difference in the interval. Rastogi at 120. It also notes that peaks could occur sooner, or later (when adjuvants are included in the vaccine). *Id.* at 121.

Dr. Efthimiou cited Rastogi to support his contentions about the timeframe in which Petitioner's receipt of a flu vaccine prior to receipt of the pneumococcal vaccine would peak in terms of immune response, thus lending support to the possibility that both vaccines played a role in his PMR. First Efthimiou Rep. at 21. Rastogi makes no mention of the pneumococcal vaccine or vaccine adverse events, however, and thus does not itself establish peak antibody timeframes for recipients of the pneumococcal vaccine.

---

[13] *Edwards v. Sec'y of Health & Hum. Servs.*, No. 20-1682V, 2023 WL 3775021, at *1 (Fed. Cl. Spec. Mstr. June 2, 2023 (quoting *Bundy v. Sec'y of Health & Hum. Servs.*, No. 12-769V, 2014 WL 348852, at *1 (Fed. Cl. Spec. Mstr. Jan. 8, 2024)). "But only pneumococcal conjugate vaccines, routinely administered to children, and covered by the Vaccine Program." *Id.* Pneumovax 23 is considered a polysaccharide vaccine, and therefore, is not a covered vaccine.

J.      S. Mori & Y. Koga, *Glucocorticoid-Resistant Polymyalgia Rheumatica: Pretreatment Characteristics and Tocilizumab Therapy,* 35 Clin. Rheumatol. 1367 (2016), filed as Ex. 36 (ECF No. 26-3) ("Mori & Koga").

Mori & Koga discusses some PMR patients who in treatment proved resistant to the most common modality used for it (glucocorticoids), and what efforts were then tested on their treatment to identify "alternative immunosuppressive agents" that could be helpful. Mori & Koga at 1374. Dr. Efthimiou referenced this article in the section of his opinion addressing his embrace of PMR as the proper diagnosis, noting that the treatment Petitioner had been receiving was recognized in Mori & Koga. First Efthimiou Rep. at 15. This article does not appreciably relate to, or advance, Petitioner's causation arguments (and while it may bulwark Petitioner's diagnosis arguments, my disposition of the claim does not turn on whether he did or did not have PMR).

K.      *Cimmino*

Cimmino (observing that PMR patients frequently also experienced peripheral arthritis–in particular featuring knee involvement) sought to evaluate the utility and effectiveness of PET/CT imaging of the knee, in order to "determine the frequency of knee inflammation and to evaluate its anatomical localization." Cimmino at 1865. Dr. Efthimiou referenced Cimmino mainly for its statement that "up to 50%" of PMR patients also experienced knee-oriented peripheral arthritis (although Petitioner did not file the citation from Cimmino underlying this assertion—an article from 1984). *Id.* at 1865 n.3. Otherwise, Cimmino is offered not for purposes of supporting causation (and indeed, it says nothing about PMR's suspected or speculated causes), but on the disputed issue of diagnosis.

L.      *Kobayashi*

Like Cimmino, Kobayashi focuses on knee-oriented symptomatic issues seen in the context of PMR, and whether testing aimed at the status of the knee or shoulder would lead to greater certainty in diagnosis. Its authors sought to test (in a sample of 60 patients) whether "the examination of the knee [via certain imaging procedures] for the pathologies beyond bursitis and synovitis would increase the accuracy of PMR classification and obviate the need for the hip assessment," concluding that diagnostic accuracy for PMR was heightened if imaging/testing was focused on the knee or shoulder rather than the hip. Kobayashi at 1186, 1189. Kobayashi says little to nothing about possible PMR causation, however; in fact, its authors specifically acknowledge (consistent with Camellino or Salvarani & Muratore) that "[t]he diagnosis of PMR can be challenging because *the pathogenesis of PMR remains largely unknown* and there are no specific serologic or imaging biomarkers"). *Id.* at 1185.

M.      *Fitzcharles & Esdaile*

Fitzcharles & Esdaile is a 36-year-old case series report discussing six PMR patients (seen in the mid-1980s) who presented "without the typical limb girdle features associated with PMR."

Fitzcharles & Esdaile at 302. Its authors deemed the evaluated cases to fit the diagnosis for PMR despite their atypical features, and they also proposed that a subset of PMR patients might see evolution from "clinical or subclinical synovitis of nonproximal joints" to the more commonly-seen PMR symptoms. *Id.* at 406. Fitzcharles & Esdaile appears to have been referenced by Dr. Efthimiou to support his interpretation of the medical records as supportive of the PMR diagnosis, despite the discrepancies observed by Dr. Oddis.

N.    S. Ahmed et al., *Case Report and Literature Review of an Atypical Polymyalgia Rheumatica and Its Management,* 16 Int. Med. Case Rep. J. 873 (2023), filed as Ex. 43 (ECF No. 30-6) ("Ahmed").

Ahmed is a case report involving a single elderly individual whose initial presentation for treatment was deemed inconsistent with PMR as commonly understood, since he complained initially of leg weakness and pain plus impaired mobility, rather than the usual complaints of morning stiffness or hip and shoulder issues. Ahmed at 873, 878. Ahmed says nothing about possible causes of PMR, however, and at most noted the possibility that some kind of prior infectious trigger was to blame (although Ahmed's authors also observed that such an explanation was undercut by the individual's "afebrile condition with mild leukocytosis" was inconsistent with an infection leading to sepsis). *Id.* at 878. Ahmed may have relevance herein to disputes about the evidentiary basis for the proposed PMR diagnosis, but it is not even a case report in which a vaccination was identified as predating symptoms onset.

O.    *Florescu*

Florescu is a review article that seeks to "to depict the current pathogenic hypothesis, diagnostic and treatment approach for patients with PMR," taking into account existing diagnostic criteria. Florescu at 1. It reiterates what is known about PMR observed in other filed items of literature in this matter, including hypotheses about immune system response features, mentioning (a) innate response cytokines as possibly increasing or encouraging inflammation, and (b) the role of T-helper cells, and/or immune system tolerance deregulation. *Id.* at 2–3. It also briefly highlights some proposed environmental triggers, including certain infections (none of which are specifically analogous to the components of the pneumococcal vaccine—although some mentioned are bacterial). Florescu was otherwise referenced by Dr. Efthimiou more to support his diagnostic contentions than as bulwarking causation.

P.    S. Muller et al., *Long-Term Use of Glucocorticoids for Polymyalgia Rheumatica: Follow-Up of the PMR Cohort Study,* Rheum. Advances in Practice 1 (2022), filed as Ex. 45 (ECF No. 30-8) ("Muller").

Muller was another article offered by Dr. Efthimiou to defend his embrace of PMR as the proper diagnosis. He deemed it supportive of the notion that some individual PMR patients will experience a more prolonged course, with a concomitant need for different kinds of treatment.

Second Efthimiou Rep. at 5–6. But because my determination does not turn on whether Petitioner did likely experience PMR, I do not include a summary of Muller's findings.

      Q.     *Shimabukuro*

Shimabukuro discusses the VAERS passive surveillance system that permits individuals in the U.S. to voluntarily report what they *believe* was an adverse event potentially associated with receipt of a particular vaccine. Shimabukuro at 3–4. Importantly, the reported adverse events are not confirmed medically by VAERS, and the system is understood to provide only evidence of potential "safety signals" warranting additional research or evaluation. *Id.* at 4, 6. Because of its nature, VAERS is clearly "subject to reporting bias," as well as potential under or over-reporting of a putative adverse event due to public awareness of a possible concern, and VAERS reports are not formally compared against unvaccinated controls, such that reliable conclusions about causation could be reached (even if VAERS generally serves a public purpose). *Id.* at 8, 9 ("it generally cannot be determined if a vaccine caused an adverse event using VAERS data").

It is not facially evident how Shimabukuro supports Petitioner on the issue of causation. At most, it underscores the fact that case reports (comparable to VAERS datapoints describing a single instance in which a particular adverse event was reported post-vaccination) have *some* evidentiary value, but of a very low sort when applied to the issue of causation. This is already a concept widely understood in the Vaccine Program.[14] Shimabukuro clearly indicates that VAERS data *does not establish causation*—and thus whatever instances Petitioner could mine from that data where a treater or individual *reported* experiencing PMR in the wake of receipt of a pneumococcal vaccine would not make causation *due* to the vaccine more likely. Rather, VAERS reports should lead to medical or scientific investigation into a potential causal link—a kind of evidence lacking in this case.

## IV.    Procedural History

As noted above, this matter was initiated in September 2022. Respondent filed a status report on April 12, 2023, indicating his intent to defend the matter, but acknowledging the lack of filed medical records at that time. *See* Status Report, dated Apr. 12, 2023 (ECF No. 19). Petitioner completed the filing of all pertinent medical records on August 15, 2023. Thereafter, the process of obtaining expert reports began, with the final report from Dr. Efthimiou filed in September 2024. I issued a scheduling order on October 2, 2024, setting forth a briefing scheduling for a ruling on the record.

---

[14] It has been repeatedly observed in the Program that VAERS data is not particularly probative of causation unless supplemented with other reliable evidence—since a VAERS report only establishes a temporal, post-vaccination occurrence. *See Vig v. Sec'y of Health & Hum. Servs.*, No. 01-198V, 2013 WL 6596683, at *17 (Fed. Cl. Spec. Mstr. Nov. 14, 2013) ("VAERS is a stocked pond, containing only reports of adverse events after vaccinations but no data about the number of vaccines administered or the occurrence of the same adverse event in individuals who have not been vaccinated").

I originally denied entitlement. However, Petitioner sought review of that determination, and was successful. *See* Motion for Review, dated Nov. 5, 2025 (ECF No. 45). In the Remand Order, the Court directs the following:

> The Court is thus compelled to remand this action to the chief special master, where he faces the classic APA choice: he can bolster his original reason for denying entitlement or essentially "rehear" the case should he decide to rest his decision on new reasons. In other words, if the chief special master believes that his conclusions in the case regarding *Althen* prong one are correct, he can simply issue a new decision that explains how he reached those conclusions.

Remand Order at *9 (citations omitted).

## V.    Parties' Arguments

*Petitioner*

Petitioner initially maintains that the evidentiary record preponderantly establishes that PMR is his proper diagnosis. Br. at 1–2. As support, Petitioner emphasizes that following the receipt of the vaccine he reported symptoms of chills, muscle aches, and joint aches, and that he continued to report such clinical symptoms of PMR in the weeks after. *Id.* at 2, 3. In addition, several of Petitioner's treating physicians involved in his care "opined that [Petitioner] diagnostically suffered from a clinical picture that included the diagnosis of PMR, even though his clinical picture represents a refractory subtype of PMR illness." *Id.* at 2 (referencing Ex. 5 at 93–95; Ex. 2 at 53; Ex. 5 at 36). Moreover, Petitioner's current treating rheumatologist opined in a filed statement that he would "lean more towards a diagnosis of PMR" and that Petitioner's "largest areas of symptom involvement included his shoulders with some lower extremity and hand involvement. *Id.* at 6 (citing Dr. Elmore Treater Letter, dated July 22, 2024 (ECF No. 35-3) at 1, 2). And through highly relevant and recently published items of literature, Petitioner argues that Dr. Efthimiou provided "reputable support for his opinion that PMR patients are known to have a similar clinical set of medical facts as [Petitioner]." Br. at 8.

Petitioner next addresses the causation prongs set forth by the Federal Circuit in *Althen v. Sec'y of Health & Hum. Servs*., 418 F.3d 1274, 1278 (Fed. Cir. 2005). First, Petitioner contends that he has established a medically and scientifically reliable theory causally connecting vaccination and the alleged injury. Br. at 21. Relying on clinical evidence and mechanistic data, Dr. Efthimiou preponderantly explained how associations examined in the various cited clinical studies support a causal link that is biologically credible. *Id.* at 22. Petitioner notes that Dr. Efthimiou provided several items of literature demonstrating that more than one vaccine, including

23

pneumococcal, is associated with triggering an onset of PMR. *Id.* at 23. Specifically, Petitioner finds significant that the "most studied and associated" vaccine deemed causally connected with PMR is the flu vaccine—which, Petitioner emphasizes that he "factually received just four weeks prior to [his] receipt of [the] Prevnar 13 vaccine."[15] *Id.* Moreover, because of the identified innate immune mechanism responses common to both the flu and pneumococcal vaccines, Dr. Efthimiou has preponderantly established "how an innate immune response from the Prevnar 13 vaccination can cause the dysregulation of immune cells already present in [an] individual." *Id.* at 26. Thus, Petitioner argues that, via multiple types of evidence, Dr. Efthimiou has provided a sound a reliable medical theory.

To further bulwark his position, Dr. Efthimiou relies on clinical studies involving the pneumococcal and flu vaccines to explain specific immune mechanisms that causally link the Prevnar 13 vaccine and a subsequent onset of PMR symptoms. Specifically, Dr. Efthimiou argues that studies demonstrate that the innate immune responses of both the flu and pneumococcal vaccines share overlapping responses. Thus, he has provided "a specific immune response 'mechanism common to both vaccines,' [that] credibly explains how [Petitioner's Prevnar 13 innate immune response relevant to the flu and Prevnar 13 clinical evidence also provides relevant support for a biologically credible causal mechanistic link." *See generally* Obermoser. Moreover, Dr. Efthimiou relies on studies to support his assertion that Petitioner, at the time of his receipt of the Prevnar 13 vaccine, was expected to have a peaked and circulating flu vaccine immune response, and therefore, his innate immune response to the Prevnar 13 vaccine could have caused the dysregulation of immune cells already present and predisposing Petitioner to experience and adverse reaction. Br. at 26.

(Notably, in arguing that he has met the "can cause" *Althen* prong, Petitioner consistently maintains that he is only subject to a *plausibility* evidentiary standard. *See, e.g.*, Br. at 22 (asserting that the Federal Circuit has "clarified the issue of the appropriate standard under Althen's prong 1" to be "biological plausibility"), 23. As noted below, however, this is wholly contrary to the preponderance standard, as the Federal Circuit clarified in a decision issued after the filing of Petitioner's brief).

Petitioner next asserts that he has provided a logical sequence of cause and effect showing that the pneumococcal vaccine is the reason for his PMR injury. Br. at 15. Based on the objective medical records and the cited medical literature, Dr. Efthimiou preponderantly explained how Petitioner's clinical presentation of pain, the morning stiffness, the generalized aches and pains, the weight loss, and symptoms of fatigue were all indicative, according to Dr. Efthimiou, that

---

[15] In his opposition, Respondent "contends that [P]etitioner has not plead this in his petition, nor in the [Motion for Ruling on Record], that the flu vaccine caused in any way his PMR." Opp. at 32. Moreover, Respondent argues that Petitioner has failed to demonstrate how the two vaccines working in conjunction could cause PMR. *Id.* at 33. I do, however, address the viability of this theory (which even if glancingly referenced, was not particularly well-substantiated) below.

Petitioner was more likely than not suffering from an inflammatory condition consistent with the diagnosis of PMR. *Id.* at 16. Because Petitioner's symptoms started "abruptly" within several days post-vaccination, and there being no record evidence to suggest Petitioner suffered similar symptoms prior to receipt of the vaccine, a logical sequence of cause and effect has been shown. *Id.* at 17. Furthermore, Dr. Efthimiou found no other cause factors present in Petitioner's medical history, clinical presentation, or alleged by Respondent's experts, that would provide a better causal explanation for Petitioner's development of PMR. *Id.*

Lastly, Petitioner briefly maintains that he has established a preponderant showing of a proximate temporal relationship between vaccination and the alleged injury. Br. at 34. Dr. Efthimiou provided items of medical literature—involving the flu vaccine and a subsequent development of PMR—that adequately supports his assertion that such clinical symptoms can occur within a day of vaccination via the innate immune response. *Id.* at 35. When considering the totality of the evidence (i.e., Petitioner's medical records and the medical and scientific literature), Petitioner maintains that Dr. Efthimiou preponderantly established a medically acceptable timeframe that involves the vaccine initiating a fast and non-specific immune response resulting in the development of PMR. Br. at 35.

*Respondent*

Respondent maintains that Petitioner has the burden of showing a defined and recognized injury by preponderant evidence—and thus must establish PMR was the likely diagnostic explanation for his injury. Opp. at 23. But Petitioner's initial presenting symptoms were not considered the more "classical" onset of proximal shoulder and hip stiffness. *Id.* at 24. Instead, his first symptomatic complaints included weight loss, fatigue, and night sweats, with any report of shoulder pain not occurring until approximately *one-month* post-vaccination. *Id.* Similarly, Petitioner's inflammatory markers, specifically his ESR/CRP levels, were not consistently associated with either his improvement and/or exacerbation of his alleged symptoms. *Id.* at 25. Moreover, his multiple reports of crippling pain and his lack of a complete response to prednisone treatment, is again, unusual with a diagnosis of PMR. *Id.* Accordingly, Respondent contends that Petitioner has failed to prove, by a preponderance of the evidence, that he more than likely suffered from PMR. *Id.*

Respondent further argues that Petitioner has failed to submit preponderant evidence establishing a reliable and persuasive medical theory. Opp. at 27. Respondent first notes that "existing case law overwhelmingly favors a finding that PMR is not caused by vaccines," and that the case adds nothing new to Dr. Efthimiou's previously relied-upon theories of causation in similarly situated vaccine injury claims. *Id.* at 2, 729; *Munoz v. Sec'y of Health & Hum. Servs.*, No. 21-11369V, 2024 WL 4113486 (Fed. Cl. Spec. Mstr. Aug. 12, 2024), *mot. for review den'd*, 174 Fed. Cl. 276 (2024), *Rule 36 Affirmance,* 2026 WL 1326559 (Fed. Cir. May 13, 2026).

In addition, Dr. Efthimiou's theory is relatively "unclear." Opp. at 29. The cited medical literature is not only "scant," but even several items of literature regarding the flu vaccine and PMR relied upon by Dr. Efthimiou explicitly recognize the absence of a demonstrated causal association. *Id.* at 31 (referencing Liozon at 5). And while Dr. Efthimiou did present a study that supported the contention that some overlap exists between the pneumococcal and flu vaccines (i.e., specific gene profiles), he failed to identify which of the overlapping genes, if any, is relevant in how vaccines activate the immune response. *Id.* at 33 (*citing* Obermoser at 3).

Next, Respondent contends that Petitioner has failed to submit preponderant evidence of a logical sequence of cause and effect, pursuant to *Althen* prong two, showing that the pneumococcal vaccine likely "did cause" his injury. Opp. at 34. A majority of Petitioner's alleged symptoms either pre-dated the vaccine at issue, were not commonly recognized symptoms of PMR, or were caused by other injuries altogether. *Id.* at 35. For example, his hip pain was consistently attributed to his osteoarthritis by treating physicians and his initial reported symptoms included fatigue, muscle weakness, and loss of stamina. *Id.* (citing Ex. 5 at 41; Ex. 6 at 2). Moreover, Respondent argues that Petitioner reportedly developed symptoms of PMR approximately twenty-four hours post-vaccination, and relying on Petitioner's own cited medical literature, such a timeframe is far too quick for such a disease onset. Opp. at 35.

Respondent concludes his argument by stating that Petitioner did not present any reliable evidence, that is consistent with his proposed theory, and in range with a medically acceptable timeframe to infer causation. *Id.* at 36.

## V.    **Applicable Law**

### A.    *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly*, 592 F.3d at 1321; *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[16] There is no Table claim for PMR as an injury associated with *any* covered vaccine, so Petitioner can only advance a causation-in-fact claim.

---

[16] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. Appx. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y, Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen*, 418 F.3d at 1278: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu*, 569 F.3d at 1378–79 (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras*, 121 Fed. Cl. at 245.

27

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has (contrary to Petitioner's assertions) consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (arguing for a plausibility standard of proof for prong one "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

Plausibility and preponderance are not synonyms. And claimants do not succeed in their prong one evidentiary burden by offering enough items of reliable evidence to find that "plausibility was preponderantly established." Rather – and as recognized by the Federal Circuit in *Cerrone* – characterizing a claimant's goal as demonstrating merely a plausible causation theory inherently amounts to lowering their burden of proof (since something that is plausible is not necessarily *more likely than not). Cerrone,* 146 F.4th at 1121 ("[b]ut the petitioner must provide the basis for a finding of causation by a preponderance of the evidence . . . As such, we have repeatedly stated that 'simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof.' LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014)"). It is not "more likely than not" that vaccine X can cause injury Y *even if* the theory for how that would occur has some baseline plausibility, supported by some individually-reliable items of evidence.

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at \*17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B.    *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir.

1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less

30

deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

### C.    *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are

31

employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D.      *Disposition of Case Without Hearing*

I am resolving Petitioner's claim on the filed record, as per the parties' request. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The decision to rule on the record in lieu of hearing has been affirmed on appeal. *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020); *see also Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided case on the papers in lieu of hearing and that decision was upheld). I am not required to hold a hearing in every matter, no matter the preferences of the parties. *Hovey v.*

32

*Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (determining that special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417; *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 71500, at *2 (Fed. Cl. Spec. Mstr. Apr. 19, 1991).

## ANALYSIS

### I.   Program Treatment of PMR as Vaccine Injury

As agreed to by the parties and reflected in their respective filed items of literature, PMR is an inflammatory condition that causes joint and muscle pain and stiffness, mainly in the shoulders and hips. Its symptoms may begin quickly or come on over several days to weeks, and are frequently worse in the mornings. It exclusively affects individuals over the age of 50, with its prevalence increasing with age. Salvarani & Muratore at 2; Camellino at 2. PMR is fairly common in the impacted cohort of elderly individuals, second only to RA. Camellino at 1. It is related to another inflammatory condition, GCA, which can cause headaches, vision troubles, jaw pain and scalp tenderness, and can be jointly experienced with PMR. *Id;* Salvarani & Muratore at 2.

As noted above, Petitioner has offered some items of literature suggesting a potential vaccine trigger of PMR (primarily if not exclusively the flu or Tdap vaccines). But almost all review articles discussing PMR that were filed in this case tend to express uncertainty as to not only PMR's pathogenesis, but its likely triggers. *See, e.g.*, Camellino at 2 ("[a]t present, we do not have a clear understanding of the aetiology and pathogenesis of PMR"); Salvarani & Muratore at 2 ("[t]he cause of [PMR] is unknown"). At best, PMR is thought to be associated with a particular "human leukocyte antigen" (cell surface proteins that help the immune system with identification)[17] or gene mutation. Salvarani & Muratore at 2. While it has been speculated that PMR may have an infectious trigger, based on "a cyclical pattern in incidence and seasonal variation," studies have yielded "inconclusive" results. *Id.* at 3; *see also* Camellino at 2.

Given the above, it is not surprising that PMR has *not* generally been deemed in the Vaccine Program to *be* a likely vaccine-caused injury. Numerous, well-reasoned decisions reject any association between PMR and covered vaccines. *See generally Jett-Crawford v. Sec'y of Health & Hum. Servs.,* No. 21-2157V, 2026 WL 1079719 (Fed. Cl. Spec. Mstr. Mar. 23, 2026) (SM Dorsey) (flu vaccine not found to be causal of PMR); *Eberline v. Sec'y of Health & Hum.*

---

[17] "Human Leukocyte Antigens" are defined as "histocompatibility antigens governed by genes of the HLA complex (the human major histocompatibility complex), a region on the short arm of chromosome 6 containing several genetic loci, each having multiple alleles…" *Human Leukocyte Antigens*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=56923&searchterm=human+leukocyte+antigens (last visited June 8, 2026).

*Servs.*, No. 23-655V, 2025 WL 3852456 (Fed. Cl. Spec. Mstr. Dec. 1, 2025) (pneumococcal vaccine not shown to cause PMR), *mot. for review den'd,* ___ Fed. Cl. ___ (slip op., Fed. Cl. May 29, 2026); *Munoz*, 2024 WL 4113486; *Sciortino v. Sec'y of Health & Hum. Servs.*, No. 22-99V, 2024 WL 4579389 (Fed. Cl. Spec. Mstr. July 24, 2024) (flu vaccine not causal of PMR); *Thompson v. Sec'y of Health & Hum. Servs.,* No. 18-1217V, 2023 WL 9053982 (Fed. Cl. Spec. Mstr. Dec. 5, 2023) (SM Oler) (pneumococcal vaccine not found causal of claimant's PMR); *Van Dycke v. Sec'y of Health & Hum. Servs.,* No. 18-106V, 2023 WL 4310701 (Fed. Cl. Spec. Mstr. June 7, 2023) (SM Dorsey) (Tdap vaccine not found causal of claimant's PMR); *Giesbrecht v. Sec'y of Health & Hum. Servs.,* No. 16-1338V, 2023 WL 2721578 (Fed. Cl. Spec. Mstr. March 30, 2023) (SM Moran) (flu vaccine not found causal of claimant's PMR); *Kelly v. Sec'y of Health & Hum. Servs.,* No. 17-1475V, 2022 WL 1781957 (Fed. Cl. Spec. Mstr. Oct. 12, 2022) (SM Horner) (flu vaccine not found causal of claimant's PMR); *Suliman v. Sec'y of Health & Hum. Servs.,* No. 13-993V, 2018 WL 6803697 (Fed. Cl. Spec. Mstr. Nov. 27, 2023) (SM Roth) (Tdap vaccine not found causal of claimant's PMR); *C.P. v. Sec'y of Health & Hum. Servs.*, No. 14-917V, 2019 WL 5483621 (Fed. Cl. Aug. 21, 2019) (SM Roth) (flu vaccine not causal of PMR).[18] While the special masters are not in agreement as to causation for a large number of adverse events, this is one topic in which *they are in uniformity*.

*C.P.,* one of the earliest of these decisions, provides some insight into why claims involving PMR as a purported vaccine-associated adverse event regularly fail. The petitioner referenced some of the same items of literature filed in this matter to suggest the flu vaccine could be associated with PMR. *See, e.g.*, *C.P.,* 2019 WL 5483621, at *23 (discussing Soriano). He proposed an immune reaction to the vaccine could spark PMR in a susceptible population (in particular the elderly), and that molecular mimicry could be the pathogenic basis for the development of a rheumatic condition. *Id.* at *22–25. But Special Master Roth stressed that no known autoantibodies associated with PMR had been identified (eliminating the relevance of arguments relying on molecular mimicry, and no filed literature supported the conclusion that PM R was likely after receipt of a flu vaccine. *Id.* at *26–27. At bottom, PMR was a disease of "unknown cause" that could not be preponderantly associated with the flu vaccine. *Id.* at *28.

My determination in the *Munoz* case also illustrates some of the deficiencies with the causation theories often offered in these matters, even though it involved a different vaccine. There, a claimant alleged receipt of a Tdap vaccine led to PMR, manifesting a few days after. *Munoz,* 2024 WL 4113486, at *1. The PMR diagnosis was not disputed. *Id.* at *12. Dr. Efthimiou was the *Munoz* petitioner's expert, and he testified at trial (comparable to the theory proposed here) that (a) PMR was a combination of autoimmune and autoinflammatory in mechanism, (b) it was likely propagated in part by T helper cells and antibodies, (c) it could have an

---

[18] Many of these cases, like the present, involve references to GCA as well, as an alternative injury or one overlapping with PMR.

environmental trigger, (d) vaccines could spark it—first by proinflammatory immune cells generated in the innate phase, then by adaptive responses to the vaccine at issue, and (e) that case reports underscored the Tdap-PMR association. *Id.* at *2–5. Dr. Efthimiou further referenced some items of literature filed in this case, like Soriano and Falsetti, and he made no evidentiary showing of a specific autoantibody he deemed would drive pathogenesis in reaction to vaccination. *Id.* at *5.[19]

I denied entitlement, determining that Dr. Efthimiou's theory was comparable to other failed theories I had heard in other cases, or had been offered in prior negative PMR decisions. *Munoz,* 2024 WL 4113486, at *13–14. I noted the theory was generic in its invocation of the expected immune response to vaccination as becoming pathogenic but lacking specificity to the relevant vaccine, and that it failed to identify things like a likely autoantibody driving the disease process, or how the vaccine might result in its creation. *Id.* Denial of entitlement was upheld on review by the Court of Federal Claims. *Munoz v. Sec'y of Health & Hum. Servs.,* 174 Fed. Cl. 276 (2024). Petitioner thereafter pursued an appeal of the matter with the Federal Circuit—but it resulted in a Rule 36 affirmance. *Munoz v. Sec'y of Health & Hum. Servs.*, No. 2025-1409, 2026 WL 1326559 (Fed. Cir. May 13, 2026) (Fed. Cir. R. Rule 36 Judgment of Affirmance Without Opinion).[20] Thus, the reasoning I employed in rejecting causation in that matter has been tested on appeal, without success—and notably, although *Munoz* involved a different vaccine, Dr. Efthimiou's theory herein relies upon Tdap heavily as analogous to the pneumococcal vaccine, given the conjugate included in the latter.

Another on-point determination is *Thompson,* which also involved the pneumococcal vaccine (although there was no dispute as to the accuracy of the PMR diagnosis in that case). *Thompson,* 2023 WL 9053982, at *2. The petitioner's causal theory was that the vaccine promoted (as part of the innate immune response) upregulation of cytokines, leading to immune dysregulation followed by an autoimmune condition. *Id.* at *13. The special master found, however, that theory as proposed over-relied on aberrant cytokine upregulation (an oft-rejected concept) and literature involving different vaccines. *Id.* at *14–16. She also emphasized how many times other special masters had rejected theories of vaccine causation of PMR. *Id.* at *16 (citing five prior decisions, including *Suliman, Kelly, Giesbrecht,* and *Van Dyke*). And *Thompson* also features some of the same literature offered in this case, like Soriano or Falsetti. *Id.* at *1, 6. In addition, my dismissal of the claim in *Eberline* alleging that the pneumococcal claim can cause PMR was recently affirmed by the Court. *Eberline,* ___ Fed. Cl. ___ (slip op., Fed. Cl. May 29,

---

[19] Other recent decisions dismissing claims that covered vaccines can cause PMR also involve the same items of literature filed in this case. *See, e.g.*, *Jett-Crawford,* 2026 WL 1079719, at *10-13 (discussing Hysa, Soriano, Liozon, and Falsetti).

[20] While a Rule 36 affirmance is not precedential in a meaningful sense, the *Munoz* appeal did offer that particular petitioner the chance to raise arguments about my reasoning, or lack thereof, in dismissing the claim—and those arguments were deemed to warrant almost no serious consideration by the Circuit. And it bears emphasis that the same attorney who represents this Petitioner *also* represented the *Munoz* petitioner.

2026). *Eberline,* as here, involved not only current Petitioner's counsel, but also expert assistance from *Dr. Efthimiou, who offered an opinion very similar to what is offered in this case, and cited literature like Camellino, Soriano, Hysa, and Obermoser. Eberline,* 2025 WL 3852456, at *4–6.

Although I can and do in this case rely more on my own direct experience in resolving PMR claims like *Munoz* or *Eberline,* the decisions of other special masters relevant to PMR also provide persuasive, useful guidance for resolving this matter.

## II.    Petitioner Has Not Carried His *Althen* Prong One Burden of Proof

As is well understood in the Program, the failure to establish even one of the three *Althen* prongs in the context of a causation-in-fact claim is sufficient basis for a claim's dismissal. *Dobrydnev v. Sec'y of Health & Hum. Servs.,* 566 Fed. Appx. 976, 980 (Fed. Cir. 2014). Because I find that the first prong has not been preponderantly established, no discussion of Petitioner's success with respect to the other prongs is necessary. (I assume for purposes of argument Petitioner did likely experience PMR, despite Respondent's well-reasoned objections to the diagnosis).

### A.    Petitioner Has Not Linked the Pneumococcal Vaccine to PMR

It is of course axiomatic that claimants can prove causation with a mix of direct and circumstantial evidence, if not *all* circumstantial evidence. Nevertheless, it is common in Program cases for claimants to identify whatever direct evidence they can muster. One kind of semi-direct evidence is proof of the fact that a vaccine's wild infectious analog is *itself* associated with the asserted injury. *See, e.g.*, *Peterson v. Sec'y of Health & Hum. Servs.*, No. 22-322V, 2025 WL 3269458, at *29 (Fed. Cl. Spec. Mstr. Oct. 30, 2025) (stating that "[i]n many vaccine injury cases, a claimant can point to the fact that a vaccine's wild viral or bacterial analog is itself associated with the alleged injury"). For example, in cases involving neuropathic injuries (such as transverse myelitis), claimants will often point out that a variety of wild infections are associated with spinal cord neuroinflammation (opening the door a bit to the conclusion that a comparable vaccine could have the same impact).

Here, that has not been demonstrated, with no evidence suggesting that a wild pneumococcal bacterial infection prompts or leads to PMR. (At best, *other* bacterial infections have in the past been *speculated* to be associated. *See, e.g.*, Camellino at 2). While this is certainly not a *requirement* to prove entitlement,[21] its absence underscores the challenge Petitioner faces in linking this vaccine with PMR (especially since *no* real environmental trigger of any kind is understood to likely cause PMR).

---

[21] I emphasize that *I am not requiring this evidence from Petitioner* as something he must offer in establishing causation. I am instead noting its absence in this case.

In addition, Petitioner could offer little in the way of evidence associating the pneumococcal vaccine itself with PMR. Even though PMR is considered to be a fairly common rheumatic condition in the elderly population, evidence connecting it to this vaccine is lacking. The only item of literature that appears to discuss the pneumococcal vaccine at all is Obermoser, but it does not address potential adverse events that might be connected to it. And the case series offered by Petitioner involve the flu or Tdap vaccines. *See generally* Soriano; Falsetti; Liozon. In effect, Petitioner seeks to analogize causation in the context of the pneumococcal vaccine to *other* vaccines (which themselves have not been preponderantly shown to be associated with PMR).

B.      Not Enough is Known About PMR's Pathogenesis to Find Vaccine Causation

Review literature specific to PMR underscores the extent to which little is known about PMR's pathogenesis or environmental triggers. *See,* e.g., Camellino at 2; Salvarani & Muratore at 2. In such a context, any number of speculative theories could be advanced (relying on the fact that PMR may involve some immune dysregulation, or feature some immune cell involvement in the processes leading to its clinical manifestation) as to how any vaccine might *plausibly* fit into its pathogenesis. But absent more specific evidence about even general issues like PMR's likely instigating factors, it is speculative to propose the receipt of a vaccine is *likely* to trigger PMR. Petitioner does not adequately or persuasively explain why vaccine causation is supported in the context of a not-well-understood disease process.

C.      Dr. Efthimiou's Theory is Short on Specifics Involving the Pneumococcal Vaccine

Consistent with the generalized quality of Dr. Efthimiou's opinion, he has not endeavored to offer the kind of specific evidence that Program claimants often provide to link the pneumococcal vaccine with PMR. Thus, no evidence has been offered that PMR is mediated by antibodies produced in response to an environmental trigger; what those antibodies would be; and how the pneumococcal vaccine would be associated with their production. This is not a case where the claimant is making an effort to show that the mechanism of vaccine-induced molecular mimicry could lead to a cross-reaction between antibodies generated in response to the vaccine and self tissues that mimic vaccine components, resulting in an autoimmune attack.

D.      Dr. Efthimiou's Theory Conflates Expected Vaccine Impact on the Immune
        System with Capacity to Cause Aberrant Results

One notable deficiency in Dr. Efthimiou's theory is the extent to which he proposes that the expected impact of vaccination—the fact that vaccines provoke cytokine production increases during the initial, innate, immune phase, for example—would increase the likelihood of an aberrant reaction. He relied generally on the idea that the impact of vaccination generally would be enough

to spark potential breaks in immune tolerance and/or an environment of immune dysregulation, in which autoreactive T cells could cause harm.

This broad argument, however, seeks to convert the intended effect of vaccination, and/or a vaccine's understood capacity to provoke *some* immune response, into something potentially pathogenic, but without sufficient probative evidence to connect all the dots. *Palattao v. Sec'y of Health & Hum. Servs.*, No. 13-591V, 2019 WL 989380, at *36 (Fed. Cl. Spec. Mstr. Feb. 4, 2019) ("claimants cannot transmute scientific evidence exploring how vaccines normally function in the immune system into a reliable and persuasive causation theory that any vaccine can be pathogenic without a more specific showing that applies to the circumstances at hand"). As noted above in my review of Dr. Efthimiou's theory, the evidence he offered in support, and then Dr. Jameson's response, the causation theory in this case largely relies on the expected innate response to vaccination to become harmful, with little specifics offered to substantiate that possibility beyond bare plausibility. And to reverse-engineer a causation theory, Petitioner assumes different autoimmune susceptibilities that are not bulwarked with enough evidence to show that vaccination likely poses risks in these contexts.

> E.    The Attempt to Link the CRM197 Conjugate Found in the Pneumococcal
> Vaccine to a Tdap Component Was Strained and Unpersuasive

A sub-component of Dr. Efthimiou's theory assumes that he could persuasively analogize evidence purportedly linking the Tdap vaccine to PMR by "shoehorning" in evidence pertaining to the Tdap vaccine's diphtheria toxoid component, based on an alleged congruence with the pneumococcal vaccine's conjugate ingredient. But these two components are not only *not* interchangeable, and the idea that this component is sufficient to result in PMR is weakly supported by the evidence in this case (and uncorroborated by other relevant decisions).

First, it is somewhat inaccurate to equate the diphtheria toxoid component of Tdap with the pneumococcal vaccine's CRM197 protein conjugate. The former is standard diphtheria toxin that has been chemically inactivated so it is no longer toxic, whereas "CRM197 is not denatured, but it still features reduced toxicity and will therefore not produce the same deleterious effects as the diphtheria toxin—its mutation renders it non-toxic." *Deshler v. Sec'y of Health & Hum. Servs.*, No. 16-1070V, 2020 WL 4593162, at *11 (Fed. Cl. Spec. Mstr. July 1, 2020). But there is a risk for chemical alterations from inactivating the toxin that is not present for the pneumococcal conjugate. *Deshler*, 2020 WL 4593162, at *11. It also bears noting that the conjugate is included in the pneumococcal vaccine *not* to provide the benefit of diphtheria immunity, but to increase immunogenicity (since the vaccine presents polysaccharide components of pneumococcus bacteria to the immune system which naturally do not get recognized without a boost). These two components are thus not equivalent; indeed, the Tdap vaccine does not include the conjugate as a substitute to diphtheria toxoid.

Second, this argument relies on the supposition that the evidence supporting a relationship between diphtheria toxoid and PMR is *itself* substantial, when it is anything but. As noted above, other special masters (including me) have resolved cases directly involving the Tdap vaccine, but found causation not established. *See, e.g.*, *Munoz, Van Dycke*. Moreover, little to nothing was filed in this case in support of this argument, other than case series articles like Falsetti.[22] Thus, this aspect of Dr. Efthimiou's opinion reflects an attempt to find some commonality between the pneumococcal vaccine and a different one, when the argument is not particularly strong to begin with, and then to propose that link has meaning due to an association that does not exist for the compared vaccine component.

F.      Case Reports are Weak Causation Evidence, and
        <u>None Were Offered Relevant to the Pneumococcal Vaccine</u>

No case reports were offered in this case to link the pneumococcal vaccine with PMR, and case series relating to other vaccines have limited value.[23] Moreover, case reports generally are understood in the Vaccine Program to have limited probative value in substantiating prong one. *Campbell v. Sec'y of Health & Hum. Servs.*, 97 Fed. Cl. 650, 668 (2011) ("[c]ase reports do not purport to establish causation definitively, and this deficiency does indeed reduce their evidentiary value compared particularly to formal epidemiological studies").

G.      Petitioner Did not Successfully Link His
        Prior Receipt of a Flu Vaccine to his
        <u>Subsequent Receipt of the Pneumococcal Vaccine In Causing PMR</u>

In an underdeveloped argument, Petitioner has attempted to include the impact of a flu vaccine he received nearly a month prior to the pneumococcal vaccine at issue as something capable of enhancing immune dysregulation, and thus contributing to an environment conducive to PMR's development. Thus, Dr. Efthimiou proposes that the flu and pneumococcal vaccines share comparable timeframes for immunogenic peak; that they can stimulate comparable immune responses; and therefore, the receipt of a flu vaccine a month before pneumococcal vaccine likely had some synergistic impact. But this argument is the epitome of a plausible contention about the immune system's response to vaccination that is not otherwise substantiated by reliable scientific/medical evidence to deem it a reliable aspect of Petitioner's causation theory. No items of evidence suggest that two vaccines received a month apart are more likely to encourage a

---

[22] In addition, I have in the context of other vaccines and injuries rejected the contention that the pneumococcal vaccine's conjugate can prompt *any* kind of aberrant response, and in those cases it has been similarly argued that the diphtheria nature of the $CRM_{197}$ conjugate is the basis for such a response. *See, e.g.*, *Gamboa-Avila v. Sec'y of Health & Hum. Servs.*, No. 18-925V, 2023 WL 6536207, at *27 (Fed. Cl. Spec. Mstr. Sept. 11, 2023), *mot. for review den'd*, 170 Fed. Cl. 441 (2024), *aff'd*, 166 F.4th 1318 (Fed. Cir. 2026).

[23] Dr. Efthimiou alluded in his third report to instances from VAERS that he deemed to link the pneumococcal vaccine to PMR, but evidence corroborating this contention was not filed—and in any event, Petitioner's own literature undermines completely the value of VAERS evidence in proving causation. Shimabukuro at 9.

dysregulated or aberrant response, or that either of these two vaccines becomes more likely to break immune tolerance if received before or after the other. All Dr. Efthimiou does here is speculate that this *could* happen, given the nature of what is known about the immune response and its capacity to harm the self under certain circumstances.

### H.    Petitioner Repeats Oft-Rejected Causation Contentions

My determination herein relies somewhat on the many prior well-reasoned decisions rejecting contentions that covered vaccines can cause PMR. This is a wholly-reasonable response to a Vaccine Act claim that mainly revisits arguments that the special masters have confronted, and disposed of, time and time again.

As I have already noted, special masters are not bound in any precedential sense by each other's determinations, and it is always *possible* in a new matter that causation can be shown even if that has not occurred before. But this does not mean other relevant decisions have no value whatsoever—or that special masters are required in every case to start from scratch, ignoring sound reasoning from prior comparable cases as if they never happened, or putting aside what a special master has learned about a particular causation theory from his work deciding Vaccine Act cases. Rather, judicial efficiency favors taking into account comparable determinations, as guidance on how a similar theory should be evaluated (and even whether it deserves any time of day at all). This is wholly consistent with the manner in which special masters are intended and expected to carry out their duties. *Hodges v. Secretary of Health & Human Servs.*, 9 F.3d 958, 961 (Fed.Cir.1993) ("Congress assigned to a group of specialists, the Special Masters ..., the unenviable job of sorting through these painful cases and, *based upon their accumulated expertise in the field*, judging the merits of the individual claims" (emphasis added)).

Dr. Efthimiou's causation opinion reiterates the kinds of arguments that other special masters—including me—have routinely rejected as unpersuasive. *See generally Munoz,* 2024 WL 4113486, at \*13; *Eberline,* 2025 WL 3852456, at \*4–6, 16–17. The expert reports offered in this case were exceedingly similar to what I reviewed in *Munoz,* even if the vaccines are not the same, and included several items of literature filed in *Munoz*. The similarities were even greater in *Eberline,* which also involved the pneumococcal vaccine. Further, and like experts in past cases, Dr. Efthimiou failed to identify a specific antigen associated with the development of PMR or antibody likely produced by the vaccine, relied on overgeneralized arguments about the human immune response, and failed to show that medical science understands enough about PMR to breathe life into the oft-rejected concept that vaccines might be an environmental trigger for it. Petitioner has not otherwise identified any more recent scientific or medical studies or articles bearing on the topic, despite due opportunity to supplement the record. There is thus nothing about this case and the evidence offered herein that is substantially different from what I and my colleagues have reviewed in prior negative determinations.

Above I have noted the large number of related PMR cases in which numerous special masters past and present considered arguments that this injury could be vaccine-caused, but found the contentions wanting. Those citations included *Munoz,* which I resolved *after trial with Dr. Efthimiou testifying*, and which was recently appealed *unsuccessfully* at the Federal Circuit, as well as *Eberline*, which involved the same vaccine as here and same expert. I reference these decisions to underscore that I am not arbitrarily rejecting the proposed theory on a whim. Rather, I am personally familiar with the arguments repeated in this case, having heard Dr. Efthimiou actually say them out loud on the witness stand, but I did not find that the way in which they were presented in this case made causation more likely than before. I reasonably took into account the similarity between this case and theories offered, but rejected, in past comparable cases.

In addition, I do not deem Dr. Efithimiou to have been particularly persuasive in advancing a preponderant causation theory. He certainly possessed a baseline level of understanding of PMR, and he assembled a causation theory that was not without any possibility at all. But his enunciation of that theory in his written reports was not enough to overcome the deficiencies I have noted above. And Dr. Jameson effectively rebutted numerous aspects of the theory presented.

I.      Petitioner Did not Carry his Burden of Proof on the First Prong

The record I have evaluated includes three written expert reports for Petitioner; two for Respondent; 17 items of literature filed by Petitioner, as reviewed above; and the parties' briefs. That record does not—*in any conceivable fashion*—amount to a preponderant showing that the pneumococcal vaccine can cause PMR. I did not find Dr. Efthimiou's opinion persuasive or supported by sufficient on-point and reliable independent items of medical or scientific literature. I am also properly guided by the numerous special master decisions reaching the same conclusion, plus my own experience with *Munoz or Eberline*. Petitioner's theory in the end amounts to the contention that the general immune stimulation of a vaccine, coupled with some specific pneumococcal vaccine components, could stimulate the immune system enough to cause a nonspecific harm later evolving into what might be diagnosed as PMR. This has a *bare* degree of plausibility—but it is far from likely.

Petitioner argues all of the above satisfied his burden of proof, but in so doing he seems to confuse the *presenting* of evidence with the process of *weighing* it. In effect, he proposes that I must accept at face value the opinion of Dr. Efthimiou; that I must give no consideration to every omission or lapse in the chain of reasoning that makes up the theory presented; that I must at every turn give him every benefit of the doubt, despite the fact that it is Petitioner's burden to preponderantly establish causation; and that I must almost wholly ignore what Respondent proposed in reaction, or what my own experience as a special master has taught me about the specific claim's strength. This construction of the work performed by the special masters could not be more in error.

41

As noted above, the Federal Circuit has recently confirmed (to the extent there was any legitimate confusion before) that satisfying the first *Althen* prong requires a *preponderant* showing. *Cerrone,* 146 F.4th at 1121. Petitioners do not successfully satisfy that burden by offering a "plausible theory by preponderant evidence"—for that amounts to adopting an inherently lower standard of proof. *Sheller v. Sec'y of Health & Hum. Servs.*, 121 F.4th 1301, 1308 (Fed. Cir. 2024) ("[a] plausible theory . . . resides somewhere 'lower than the preponderant evidence standard required to prove entitlement to compensation, but [higher] than a mere scintilla'" (citation and quotations omitted)). It certainly is not beyond the realm of *possibility* that the immunologic impact of a pneumococcal vaccine could trigger a process leading to PMR, but it has not in this case been preponderantly shown that this is *likely* (and indeed—based on the evidence offered, I conclude it is *unlikely*).

All of the above is consistent with something foundational in this case that cannot be gainsaid by Petitioner: PMR's pathogenesis is not yet well understood, with little in the way of evidence to corroborate speculation about its possible causes or triggers. Camellino at 2–3, Salvarani & Muratore at 2–3. Since PMR is common (albeit to an elderly population), there should be more evidence available to Petitioner linking vaccines (or some other environmental trigger) with its initiation. But there clearly is not. All that is left is Petitioner's effort to string together a number of pieces of speculative evidence, or truisms about the immune response. That sum does not amount to a preponderant showing.

## CONCLUSION

On remand I am bound to follow the directives of the Court. The expanded analysis herein is intended to assuage the concerns expressed in reaction to my original decision. But the result is the same: Petitioner has not carried his burden of proof. It has not been preponderantly shown the pneumococcal vaccine can cause PMR. As I also noted in *Munoz*, my reasoned view is that claims that PMR can be vaccine-caused should no longer be advanced by Program counsel, absent some new scientific/medical discoveries bearing on the subject (which certainly were not offered in this matter). *Munoz*, 2024 WL 4113486, at \*14.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[24]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[24] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.